And the next case is Jackson National Life Insurance Company v. Sterling Crum. We have Mr. Zweigle and Mr. Miller. And Mr. Zweigle, if you are ready to proceed, please begin. Thank you, Judge Branch. Good morning, and may it please the court. My name is Scott Zweigle, and I represent Appellant Sterling Crum. The question presented by this appeal is whether a life insurance policy taken out by an insured him or herself without any third party involvement is void ab initio as an illegal wagering contract if he or she applied for the policy with the intent to sell it on the secondary market in the future. We respectfully submit that the governing Georgia statute and applicable law, including decisions of the Georgia and United States Supreme Courts, are clear. Such a policy is valid and voidable within the policy's contestable period, but not void ab initio, meaning void at the policy's inception. The district court erred by establishing a standard never before used under Georgia law in a manner that turns Georgia's public policy as defined by the legislature and described by Georgia courts upside down. We respectfully submit that the district court decision should be reversed and remanded with instruction to enter judgment declaring Mr. Crum is entitled to receive the policy's death benefit with interest. Your honors, an individual who procures a policy, a life insurance policy on his or her own life has a valid contract with the insurance company. A third party who contracts with the insurance company to insure the life of someone else for whom they have no insurable interest as a wagering contract that is void ab initio. Courts evaluating this issue look to who in substance procured the wager and what is not. Here, the district court made a factual determination that the insured procured the policy without the involvement of a third party. We submit that the appropriate application of this finding is dispositive under Georgia law. Pursuant to OCGA 3320, your opposing counsel is going to be arguing that the district court's decision on that factual finding was clearly erroneous. Anticipating that argument, why do you think it was not? Thank you, Judge Carnes. There are multiple reasons why that finding was not clearly erroneous. There was absolutely no evidence in the record of any third party involvement at the inception of the contract. The insurance policy itself, which is at the record at docket number 127-11 was signed by the insured himself, Kelly Couch. It was witnessed by an insurance agent that was authorized to submit applications to Jackson. And Mr. Couch made the payments, the initial payments from his own SunTrust bank account. He made all the initial payments under the policy himself. There was absolutely no evidence. I'm sorry. He actually made the payments. Yes, the district court found that he made the payments for eight months, but the record also has evidence that the payments continued to come from his bank account through May of 2001. But that was a lie, right? At some point. Oh, I've seen this. No, your honor. There was a check that was sent to Jackson National for $160 that was from Kelly Couch's bank account that was meant to cover the premium payments through May of 2001. The issue I think that you're referring to, it was not a lie, but there was some Mr. Crumb speculated in his testimony that when he purchased the policy, he thought some of that money went into a premium reserve account in order to pay for the premiums. But that was just his speculative testimony. And there was no evidence that that actually occurred. The actual evidence in the record is that the money came directly out of Mr. Couch's bank account. Let me ask you, Mr. Slago, to my mind, the district court did not rule on the laches argument, which I thought was a pretty strong argument for the defendant. And so let me take you through the thought process on that and what you say. Here is what I anticipate the defense counsel can say on that since we've got you here. I'll state it so you can respond when you have all these minutes to respond. What the defendant needed to show was that there was a third party involved and had, this claim was made 11 years after the death, after the brokerage house had gone under, when there was really nobody left to talk to. I mean, your client didn't even know the person well enough to know they've been dead all this time. But the argument I would think would be, had we known this, had the claim been timely made, we still had a brokerage, we could see what their method of operation was. We could see how they got clients, we could see whether or not they were the ones involved. Somebody claimed she did this HIV test, the guy had HIV. We could, all sorts of facts could have been produced from which one could infer that, of course, at the time, this man who had no relatives and had two years to live, of course, he's not getting a life insurance policy for any reason but to sell. And from that, you can infer that the third party had to be helpful, because you'd have some perhaps testimony from the brokerage house, the broker, that they were in fact, you know, setting this up later to be paid off, maybe they would have lied, maybe they wouldn't have said it. But the fact that every that there was such a long way is, to my mind, create some argument for latches. And I know the district court didn't reach that. But if you could answer that, I would appreciate it. Yes, Your Honor. So Mr. Crumb made the claim on the policy as soon as he figured out that Mr. Couch had passed away. He did not delay in making the claim, which is the Georgia Court of Appeals and Georgia Supreme Court require for a latches argument under insurance policy. I would also direct the court to docket number 125, which is Judge Ray's statement and closing argument, page 96, lines three through 15, where Judge Ray said that this case was not going to be decided on delay, notwithstanding that he didn't reach it in his ultimate written order. He found that the defendant, Sterling Crumb, claimed on the policy as did not act in bad faith when he claimed. And this I'm quoting Judge Ray. In other words, he didn't delay seeking to cause any harm to plaintiff. And with respect to the evidence being available, Judge Ray made the astute observation that the files from this brokerage house were all produced in discovery here. Mr. Crumb's attorney got them at a later date, and they were all produced. So all of the files that would tend to show third party involvement were produced here. And all of those files demonstrated that the third party became involved at the earliest in May of 1999, which was nine, 10 months after the inception of the policy. And under George latches in Georgia require bad faith to back up to something else. You said, does it require a specific finding of bad faith? I can't remember. Georgia law requires a finding of prejudice. It doesn't necessarily find bad faith. But that's I was quoting Judge Ray in his, I was just wondering how relevant it was that he didn't act in bad faith. It sounds like prejudice is the more relevant question. Prejudice. Yes, Your Honor, I would agree prejudice is the more important question. And that gets to another reason why the latches argument fails is because there was no prejudice to Jackson National, they had all of the documents that they would have needed to show third party involvement. Mr. crumbs testimony was undisputed that he did not meet Mr. couch until August of 1999. And all of the files that show some interaction between a third party and Mr. couch are dated after the policies inception. The evidence here demonstrates that Mr. couch took out the policy on his own on his own life. And there was no third party who caused him to procure the policy, which is standard. You agree that if a third party were involved, then the policy would be void of an issue, right? Yes, Judge grant. I agree that if a third party caused Mr. couch to procure the policy, it would be void of an issue. But there was absolutely no I know, I know what you think on that front. But if assuming that that is the correct view of the where does the statute not interfere with that determination, as well? Does the statute specifically say third parties can't be involved? The statute specifically says that a third party without a beneficiary interest has to procure or cause the policy to be procured on an individual for which he or she does not have an interest. So but you do think that if if Mr. couch made the policy with the intent to sell it from minute one, you think under Georgia law that that would be okay, correct? Yes, Your Honor, that would be okay. Because an intent to sell gives Mr. couch, it doesn't equal an intent to wager. And also, I'd like to direct the court to the US Supreme Court decision in Grigsby versus Russell, which found that life insurance policies have all of the ordinary characteristics of property. And that decision has been extended throughout Georgia jurisprudence, which means that if somebody has an intent to sell a policy, that's not enough to constitute a waiver. If you intend to sell it from the first moment, why isn't that a wager? It's one thing if you want to give the money to your children, and you get the policy, but later you decide to sell it. But why isn't it a wager if from the first moment you intend to sell it? Yes, Your Honor, that's because the public policy underlying this particular life wagering policy is that we don't want to ask third parties, we don't want to give them a reason to hasten the deaths of somebody else. And in the Grigsby versus Russell decision and other decisions, it says that if an insured himself, and I see that my time is up, man, if you would finish answering Judge grants question, thank you, Judge Brandt. So an insured himself, an insured intent alone, an insured can act for any reason. It's a property interest. And if a count if somebody wants to get money from an insurance policy, they have to do it. There needs to be a wager at the beginning of a policy to make something void at inception void ab initio. There was no wager when it's just the insured because insured has a pecuniary interest and an interest in their own life. And a wager requires only a pecuniary if Judge Branch will indulge me have one more very question. I like a very quick answer to which is, if we're basing this on Georgia's public policy, why shouldn't we certify this question to the Georgia Supreme Court to let them tell us what Georgia's policy is rather than us deciding for ourselves? Thank you, Judge grant. I would say that the cases under Georgia law are that the statute is clear that in order to call something void ab initio, it requires an individual to third party without an insurable interest to procure or cause the policy to be procured. There was no evidence of this in the case. So this is not the appropriate case to do that. All right. Thank you, Mr. Michael. I got your name right that time. Mr. Miller, you may proceed. Good morning. Thank you, Your Honor. May it please the court. Michael Miller for Jackson National. This is a case about human life wagering. Human life wagering has been around for hundreds of years. And the particular type of human life wager that's at issue here is called a biatical clean sheet deal. These deals were developed during the AIDS crisis. And the people who put these policies together were ginning them up on insureds who were already HIV positive or already dying of AIDS. And in that context, the context of a biatical clean sheeting transaction, the district court made a series of findings in this case. And these facts are pretty dark, but they were never contested by the appellant anywhere in these on this appeal. And the facts are worth a brief review. This policy, for example, the district court found that the insured neither wanted nor needed this policy. The insured just wanted cash. This guy was a house cleaner. He made eighty five thousand a year. He had no dependents. He was unmarried and he was HIV positive. And in that context, the district court said found, as a matter of fact, uncontested that there was a secondary market for these biatical policies and the demand in that market actually exceeded supply. And this particular insured had the intent to wager on his own life by injecting a million dollars worth of insurance, biatical clean sheeting insurance into that supply. And the policy here is only five hundred thousand. There's another five hundred thousand dollar policy that's not at issue. Mr. Miller, can you point to one Supreme Court of Georgia or Georgia or Court of Appeals of Georgia case where the court found that when a person takes out a life insurance policy on his or her own life and has a later intent to sell policy, no third party is involved, that that is, in fact, void ab initio. Your Honor, in virtually all jurisdictions, if the policy is incepted properly nowadays, that policy is a property right and can be sold on the secondary market. That's a legitimate market. It's regulated in every state and that can happen in every state. But in Georgia and virtually all other jurisdictions, if at the moment of inception there was an intention to engage in a human life wager, then the policy is void. And if you look Georgia law, Georgia is some of the strongest anti human life wagering law in the country. Georgia law has got 120 years of common law, Georgia Supreme Court precedent. And all of those cases, Your Honor, are very, very clear. Human life wagers are a violation of public policy in Georgia. Those policies are void ab initio, full stop. The form of the transaction is meaningless. There's a great quote in low, but there's quotes all throughout the years. The circumstances, there's no one particular circumstance that you look at. You look at all circumstances and they're scrutinized. And if the intent at the outset of the transaction was for this to be a human life wager in Georgia, it's void full stop. Let me ask you this question, Mr. Miller. Obviously, this case seems very fishy, but fishy may not mean illegal. And how what you propose seems to So what you're saying is, okay, we know for sure if you're even your position is if the insured buys the policy, and later decides to sell it, that's fine. Nobody disagrees with that. But your position necessarily has to be if the insured bought the policy immediately with the intent to sell it to let somebody wager in his life. That's for both. You can't do that. How do we after the of an insured and how fair is that going to be for a person who's bought the policy under a regime that maybe unwisely allows that to happen? And how do we sort through these things? Understood, Your Honor. And just to be clear, again, in virtually all jurisdictions, a public policy decision has been made that if the policy is acquired at the outset for legitimate insurance purposes, it can get traded on that secondary market. Virtually all jurisdictions have snapped the line and said, however, at inception, if at inception, the policy was intended to be sold on the secondary market and was intended to be a human life wager, we're not going to allow that because we don't want policies traded on a secondary market where strangers are betting on when these insureds were going to die. And the question is, it's going to create lots of difficulties unraveling things 5-10 years later to figure out what that subjective state of the insured. Two things. I think the short answer to that, Your Honor, is no, for two reasons. Number one, in this particular case, it's not a problem because the district court made a finding that no doubt this insured when he took out this policy intended to wager on his own life. It was so clear that the appellate challenged zero of those facts. The second point is this is what the Georgia Supreme Court has been saying. And you go back all the way to the Walton case, this is the Georgia Supreme Court. It's all the way back in 1899. This was a case where the insured acted alone, named someone as a cousin and a beneficiary, and that person wasn't a cousin. The court nevertheless conducted an insurable interest analysis, ultimately determined that the case was not a wager, but reviewed all of the Georgia case law on the issue of insurable The true rule is that one may ensure his life and make the amount of the policy payable to whom he pleases, provided the contract's not made at the expense and for the benefit of the person designated as the beneficiary as a cover for a mere wagering contract. So there you were 100, however many years ago, the Georgia Supreme Court in a case where the insured acted alone, saying you can't have a wager. And there is a string of them, Your Honor. And another one that's important and worth mentioning is the Bray case, which is from 1942. Again, it's the Georgia Supreme Court. And in this case, Your Honor, they actually cite the applicable statute and then restate what the law of Georgia is. And again, in Bray, this is an insured acting alone, someone who named his own wife, and then they got divorced. This insured definitely acted alone. If you look at the quote, there's a statute, it's section 56903. And it's very, very similar to the 24.3b. And it quotes the statute, it says the insured may direct the money to be paid to his personal representative, or to his widow, his children, or his assignee. That's very broad statute goes on. Upon such direction given and assented to by the insurer, no other person may defeat the same. So this is a court recognizing back in 1942, that the insurable interest statute is very broad, gives wide latitude to insurers to name whoever the heck they want as the 3324.3b, the existing statute today. But then the Supreme Court of Georgia, in the very next sentence states, this right is not unqualified. And they say this, according from another Georgia Supreme Court case, one has the right to procure insurance on his own life and assign the policy to another who has no insurable interest in the life insured, provided it not be done by way of cover for a wager. So there you have it, again, an insured active alone. There's a statute like the one that exists today. And the Supreme Court of Georgia says this can't be a wager. And Your Honor, their idea that this 1960 statutory regime development somehow wiped clean, whatever it is, 80 years of common law just does not hold water. The abrogation standard is very high. And you have, I mean, obviously, the legislature is presumed to understand that what common law exists, which in this case are extremely powerful Supreme Court cases, the legislation, if it can be is to be interpreted harmoniously with the existing common law, and it can in support of Jackson Nationals position. If the legislature intended to abrogate, the language must be clear. And in other cases, it's stated differently that it must be done with clarity. And in this case, we don't have anything like that. The only thing we have is this statement in paragraph K of the existing statute that comments, the legislature is actually commenting on the existing common law. But they don't talk about abrogating it, they talk about adding to the common law. And they're saying that these insurable interests are not in lieu of the existing common law. So you can scour the statute, the legislative history, the comments, etc. There's no word like supersede or replace or anything like that. And this 3324 3d is exactly like what's been on the books in Georgia for many, many years. And just one other point, what do the what do the statutes and the case law tell us about when a human life wager exists? Is it the involvement of the third party? Can it simply be in the mind? Because what if in this case, where we know he had HIV, and he took out the the life insurance policy, and he had a thought that he wanted to sell it? What if in a month, he went and found out that that was, he later finds out that that was a false positive test, that in fact, he doesn't have it. And he decides, I'm not going to sell it now after all. So how do we determine when the human life wager exists? In virtually all jurisdictions are the same on this, Your Honor, it's the moment of inception. And if the intention at the moment of inception, moment of inception of what of the policy so that in this instance, January of 1999, I think it was January 17 1999, this policy was issued when it became effective. If at the moment it became effective, the intention was to create a wager contract. Georgia Supreme Court precedents going back 120 years is very clear. That's a violation of public policy in Georgia, and it's void. And just one item to mention, and I'd like to move on to the delay issue. But this is really important. I mean, Mr. Crum's whole argument on insurable interest is that somehow this all got abrogated. We cite the Lyles case in our brief. Lyles is a 1973 Georgia Supreme Court case. So this is 13 years after this supposed statutory regime change and abrogation. Lyles is another case where the insured acted alone. And the court describes how the insured acts alone. And in the very next sentence, quotes Clements that says, yes, but it can't be a human life wage. A person has an unlimited insurable interest in his own life and can, where there's no intent to enter into a wagering contract, lawfully take out a policy of insurance on his own life and name whoever he wants. So Your Honor, I understand these aren't easy cases. But this one is, we know what this insured did. We know what Georgia law is, these policies are void full if there was an intention at inception for a wager contract. These are perfect facts for it, and they don't even contest them. One question before you move on. Can you repeat the citation to the old Georgia statute that you mentioned a few moments ago? The 56903 is the statute that's cited in gray. That's the one that's comparable to the current statute. Thank you. So let's talk about the leg. There are major public policy issues that exist for why insurance companies need to be notified of claims within some period of time. And that's for obvious reasons, right? Memory fade, documents are lost, information's lost, people are lost. The delay in this case, it's interesting. Fundamentally, Mr. Crum is conceding that this is a human life wager, but is saying that we do not have evidence to show that a third party participated in the wager. But the reason we don't, we think we have that evidence and we think we've established it. But if we don't have it, the reason is because of their delay. And the delay facts here are extreme. It was a 12-year delay. Mr. Couch died in 2005. And the investors here, Mr. Crum and his attorney Jantos, continued to pay the premiums until 2009 when they elected to let the policy lapse. But they still didn't know he was dead. They didn't tell Jackson until 2016, and they didn't file the claim until 2017. So it was a 12-year delay. And in the analysis, right, the first that's going to pop into your head, well, do they have an excuse? No, they don't. They were awful about this. Crum, this is uncontested. He relied- Let me interrupt you, Mr. Miller. You don't have a lot of time. Just speaking for myself, this is an inordinate delay and some due diligence, I think the case law is required. And it seems like there was no due diligence by Mr. Crum. A hundred percent. So let's assume for the sake of argument, I'm with you on all that, but you still have to show prejudice. And what Mr. Zweigel had said is that you can't meet that prejudice showing. Could you address that for me, please? Yeah, two points. First, Your Honor, under the Burton standard, we don't have to show- There's two arguments based on delay. First, it's a contract argument under Burton. Burton stands for the proposition that insurance policy does not contain a set time to report a claim. Then as a matter of contract, the court will imply that it's a reasonable amount of time. There's no reference to prejudice. And if you look at the corpus juris secundum references that are cited therein, they make it clear. There's no prejudice requirement in that setting. In the Latches setting, it's a broader basic equity analysis. And there's an analysis, including whether there was some detriment suffered by the party that was not in delay. And here he has no excuse. And the prejudice was very, very significant. Number one- Okay, that's what I keep trying to tell me. Thank you. I'll go to it. Three items immediately come to mind. Number one, the, again, analysis for the purpose of whether this policy was valid focuses on the moment of inception, 1999. Mr. Crum admitted that he had emails from 1999 that related to this transaction, but he lost them in 2015. So now we don't have them. Mr. Frick, his broker who was involved in this, likewise admitted that he had emails from 1999, which is that critical moment, but they're gone. And Your Honor, then I go to your point about the brokerage, which is Associates Trust. We know that Associates Trust was involved in 1999. We know all sorts of things about Associates Trust. And if this claim was brought to our attention in 2005, we would have gone immediately there, deposed Mr. Keith Thomas, we would have subpoenaed them for all of their records, etc. And we would have discovered what went on here. But we didn't know that there was a claim. They were in business in 2005, 2006, 2007. And they went out of business in 2009. And when this claim was brought to our attention in 2017, and the litigation was filed in 2017, there was no one left to subpoena. Associates Trust was gone. They didn't have any records. And Mr. Thomas was dead. And also the files that we have are not complete. When we sent our subpoena in, we were told that they had zero records. So we did suffer prejudice as a result of the delay. Although again, under Burton, we don't even require prejudice. It's just whether it was a reasonable amount of time. And this certainly as a matter of law is not reasonable. Thank you, Mr. Miller. Mr. Zweigel, you have five minutes on rebuttal. Thank you, Judge Branch. And if I can go straight to the latches argument that Mr. Miller was arguing, I think that he misrepresents the record when he says that there were emails that were lost. Mr. Crumb said he might have had emails at the time, but there would have been nothing that connected him with couch at the inception of the policy. Also, he misrepresents Mr. Frick said he didn't communicate via email about these things in his deposition, which is in the record. I also want to point out on the latches argument that Mr. Crumb did not just sit on his hands. He hired counsel to assist him with tasks related to the policy. Council conducted searches for couches on couches death for many years up through 2009. When Mr. Crumb said that the policy premiums were too expensive and stopped paying not knowing that Mr. couch had died in 2005. So there was due diligence done during that 2005 to 2009 time period. I thought the record Mr. Zweigel though was that some things were done, but that even uh even your client Mr. Crumb or whoever he hired admitted more vigorous efforts could have been taken. For example, I thought the record indicated that Mr. Couch had an obituary published in the newspaper that it seemed to be about a very lackluster effort by this attorney that Mr. Crumb hired. Well, Judge Carnes, I agree that there was an obituary. This attorney did perform Google searches, which is the record evidence and did not come up with the obituary. It was not until he received a new product that allowed him to search uh in 8 of 2017 that he was, bless you Judge Grant, that he was able to find the policy. So he did not sit idly on his hands. He did stuff and there's really there's nothing in the contract that requires Mr. Crumb to make a claim on a life insurance policy within any period of time. It's different for a disability policy, which was an just says in order to make a claim on the policy, submit the policy, prove that you're the beneficiary, which is stipulated here and then the policy needs to be has to be paid. So there's nothing in the record uh that to Mike Miller's point on on Burton, my colleague's point on Burton that would cause that to be applicable here in this case. What if he had waited 20 more years? Is there a latches argument then? I don't believe that there's a latches argument because there is no prejudice here. Um although if he did find out about the policy in 2017 and then intentionally waited 20 the death in 2017 and intentionally waited 20 more years, I would say that there's pretty strong evidence of latches here. Here Mr. Crumb made a the claim on the policy as soon as he was able to determine that uh Mr. Couch died. Also it shouldn't be lost. It wasn't a factor though. I'm sorry? I thought you said before that bad faith is not a factor in the latches determination. I don't believe that. I think that you have to show prejudice. Um I don't I don't think that bad faith on Mr. Crumb's part matters. That is correct. I also want to point out uh one argument that Mr. um my colleague asserted that we can see that this is a wager. That's not the case at all. The cases talk about cover for a wager, meaning cover for somebody else procuring the policy at inception. The cases in the statute can all be read together. Uh everything means at inception, a third party has to cause an insured and that's based on the public policy which underlies human life wager which means we don't want person B taking out insurance on person A's life in whom they have no insurable interest. That's the public policy. It's not implicated. If you plan to sell your policy at the moment you sign your policy right under your theory at that point no one else is taking out a wager on Mr. um couch's death but doesn't a plan to sell a policy just mean that wager is delayed for say a week or a year or whatever at that at that point you still have you still invoke the same concern that whoever's buying the policy would hasten the client's death. Uh no your honor because under um 33-24-3 an insured has an unlimited insurable interest in his life and there are many cases cited in our brief that say when an insured takes out the policy on his own life human wagering is not implicated and that was recently in a decision that you issued in the Malkin v. Wells Fargo case which says you look at who in substance procured the policy. That was Delaware law right? That was Delaware law which has a substantively identical statute that uses the procure or cause to be procured language. So all of the courts who look at this look at at inception who actually took out the policy. Here it's undisputed that it was Mr. Couch because his rights were unlimited it does not matter if he had an intent to sell and also none of the misrepresentations mattered. The court of appeals in Georgia court of appeals in Sheehan made that claim because there was no wager at the inception of this policy we respectfully request that this court reverse the district court's order and remand with instructions to enter judgment for Mr. Crum. Thank you. Thank you. Thanks to both of you. We have your case under submission.